

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| AMSOUTH LEASING CORPORATION, | } |
| Plaintiff, | } |
| v. | } CV 02-AR-0884-S |
| NURSERY SUPPLIES, INC., | } |
| Defendant. | } |

**ENTERED**
**FEB 1 3 2003**

**MEMORANDUM OPINION**

Before the court is a motion for summary judgment, a motion for sanctions under Rule 26(c)(2), and a motion to strike, all filed by plaintiff, AmSouth Leasing Corporation ("AmSouth"). AmSouth is seeking to recover damages for breach of its Master Lease Agreement ("master lease") with defendant, Nursery Supplies, Inc. ("NSI"). AmSouth and The Lerio Corporation ("Lerio"), entered into the master lease on June 15, 1996. On February 25, 2000, Lerio and NSI entered into an Assignment and Assumption of the Lessee's Interest ("assignment"), which AmSouth consented to.

**Facts**

The facts will be stated in the light most favorable to the non-movant, NSI. When the court sometimes cannot understand what the facts are, the court will adopt NSI's version, even if it does not make sense. The lease purports to be a "finance lease" rather than a "consumer lease" under the UCC. Under the master lease, AmSouth purchased two extrusion blow molding machines ("molding machines") manufactured by Cincinnati Milacron, Inc. ("Uniloy") for lease to

1



Lerio. The two molding machines were designed for use in the manufacture of plastic flower pots.

Pursuant to the master lease and assignment, NSI was obligated to pay AmSouth $18,075.18 per month from March 11, 2000, through December 11, 2001, the date of termination of the master lease. NSI made all lease payments when they became due through the termination of the lease on December 11, 2001.

The master lease contained a purchase option addendum ("purchase option") executed on December 11, 1996. Pursuant to the purchase option, NSI had the option to purchase the equipment at the end of the lease term for the greater of $191,877.72 (called the "residual value", which is 20% of the original purchase price of the leased equipment) or the fair market value of the equipment. To exercise the option, NSI was required to provide written notice to AmSouth of its intent to exercise the option at least 180 days prior to the termination date of the master lease. NSI did not provide notice of its intent to exercise the purchase option.

On November 16, 2001, one month before the end of the lease term, AmSouth sent NSI an invoice for $191, 877.72, the residual value of the molding machines, to be paid on December 11, 2001, the end of the lease term. Shortly after the end of the lease term, NSI contacted AmSouth with notice of its desire to return the leased equipment rather than purchase it. On January 9, 2002, an email was generated memorializing NSI's request to return the equipment.

On January 18, 2002, Mr. Phil Cooper ("Cooper"), a vice president and asset manager of AmSouth contacted Jeff Jones ("Jones"), the CFO

of NSI, to discuss the return of the equipment. During this discussion, AmSouth expressed its desire to have the molding machines inspected and the condition of the machines certified prior to their return pursuant to section XI of the master lease.[1] During this same discussion, NSI sought to negotiate with AmSouth over the inspection and certification requirements because NSI was experiencing practical difficulties in arranging for inspection and certification.

According to NSI, AmSouth contacted Pearl Equipment Company, Inc. ("Pearl") that same day to arrange for the marketing of the two molding machines. On January 21, 2002, Pearl sent a letter notifying AmSouth that it would be possible to liquidate the equipment at a level higher than the residual value under the master lease, namely $250,000.00. NSI contends that AmSouth was initially receptive to NSI's attempts to reach an economic solution in lieu of the required inspection until AmSouth found out that it could sell the equipment for more than the residual value.

NSI says that it originally proposed to pay the difference in value between inspected and certified machines and uninspected

---

[1] Section XI (b). If requested by Lessor, Lessee shall, at its sole cost and expense, take any or all of the actions described . . . Lessee shall arrange for inspection of each Item being returned hereunder by an appraiser, servicing organization or manufacturer's representative satisfactory to Lessor to assure compliance with the terms of this Section XI; (ii) Lessee shall provide for additional de-installation, packing, transporting and certifying of the Equipment, including the following . . . (B) certification of each item by the manufacturer's representative or servicing organization indicating such Item is eligible for such manufacturer's or organization's regular maintenance plan (which certification shall be transferable to another operator of such item)... ." (Section XI of Master Lease, Def. Exh. 3).

machines. Although the court cannot follow the negotiations, or the significance of the figures mentioned, at some point during negotiations, AmSouth quoted to NSI a value of $100,000 for both machines absent inspection versus $300,000 if inspected and certified. Nevertheless, AmSouth and NSI could not reach an agreement.

According to NSI, during the same time period that it was negotiating with AmSouth, AmSouth was negotiating to sell the equipment to an ex-employee of NSI, Darryl Davis ("Davis"), provided the equipment complied with the master lease. According to NSI, Davis provided AmSouth with a letter on February 14, 2002, detailing his assessment of the condition of the molding machines and expressing his company's desire to lease them. On March 13, 2002, AmSouth sent a letter to NSI asserting that the equipment needed to be inspected and certified prior to its return for resale. According to NSI, AmSouth at this point ceased all negotiations with NSI over an alternative solution to inspection and return of the equipment, and instead began to insist on strict adherence to the requirements of the master lease. AmSouth also generated an invoice claiming entitlement to rent and late payments for the period of December 11, 2001, through March 11, 2002.

On March 25, 2002, NSI sent a letter to AmSouth offering to purchase the equipment, in an "as is" condition for $160,000. In addition, NSI agreed to pay one month of rent because it did not timely notify AmSouth of its intent to return the equipment. On April 2, 2002, AmSouth filed the present action.

NSI contends that on April 23, 2003, it made a final offer to

resolve the controversy, but AmSouth did not respond. NSI contacted Uniloy and arranged for an inspection of the molding machines. The inspection was conducted on June 3, 2002.

In opposition to AmSouth's motion for summary judgment, NSI has submitted an unsworn and unauthenticated copy of Uniloy's report[2] describing the condition of the two molding machines, and a letter reportedly from Uniloy to counsel for NSI that states that Uniloy does not have a certification process for used equipment. (Exhibit 13 & 14).[3]

According to NSI, even though Uniloy does not have a certification program for used equipment, AmSouth has remained steadfast in its insistence on the equipment's being inspected and certified; this despite the fact that AmSouth itself does not have a written procedure for "certification." Cooper testified as follows:

> Q. In the past, have you ever had Milacron certify a piece of blow molding machinery?
>
> A. No, I have not.
>
> . . . .
>
> Q. My question is: Have you ever approved a Milacron factory representative with respect to the inspection or certification of a piece of blow molding machinery?

---

[2] According to the report generated by Uniloy, the two molding machines are apparently in good operational condition, with the exception of a few minor correctable problems and normal wear and tear.

[3] AmSouth has filed a motion to strike exhibits 13 & 14 as inadmissible hearsay outside of any exception. Additionally, AmSouth points out that neither document was turned over to counsel prior to being filed with the court and neither document has been authenticated or sworn.

5

A. No.

Q. What is the criteria that AmSouth Leasing Corp. would use to determine whether or not they would approve a representative of Milacron?

A. We have never — I shouldn't say never. In my tenure with AmSouth, they have not had an instance where that was necessary other than this particular case.

Q. So since the time you've been with AmSouth Leasing Corp. you've never had to have a piece of machinery certified by a manufacturer's representative.

A. Correct.

Q. Are there any written procedures in place at AmSouth Leasing Corp. for how you go about approving a manufacturer's representative?

A. No, not to my knowledge.

Q. Have you ever had equipment returned in your tenure at AmSouth Leasing Corp. that was not inspected and certified?

A. Yes.

Q. As we sit here today, has AmSouth Leasing Corp. ever designated a carrier through whom this equipment should be shipped or a location to where this equipment should be shipped by Nursery Supplies, Inc.?

A. No.

* * *

Q. I assume that since you've never advised Nursery Supplies, Inc., through whom or to whom they should ship this equipment, that they have likewise never refused to do so?

A. The shipment of the equipment would take place after the inspection and certification.

Q. Has AmSouth Leasing Corporation ever in the past required an inspection certification prior to a piece of machinery being returned other than in this case?

A. Again, I cannot speak of AmSouth Leasing in the past, but during my tenure, we've requested it.

6

> Q.  Have you required it?
>
> A.  We have not had an occasion to do that; to require it.
>
> Q.  So you have - - Like I say, I mean, AmSouth Leasing Corp. has allowed machinery to be returned which had not been inspected and certified?
>
> A.  I think I would answer no.
>
> Q.  Has AmSouth Leasing Corp. had machinery that was leased returned prior to this particular equipment?
>
> A.  I don't believe so. Again, not during my tenure.
>
> Q.  So during the two years that you've been there, the purchase option has been exercised or the lease renewed on pieces of equipment held by AmSouth Leasing Corp.?
>
> A.  I believe that's correct.

(Cooper Depo. at pp. 56-59, 62-64).

It is NSI's position that by requiring inspection and certification procedures that are not available, and by not designating a location and/or carrier to facilitate the return of the subject equipment, AmSouth has refused to allow NSI to return the equipment.

AmSouth, on the other hand, avers that NSI has breached the master lease by: failing to maintain the leased equipment; refusing to return the leased equipment in the same condition as when received, wear and tear excepted; refusing to arrange for inspection and certification of the equipment, and; failing to pay rent as required by paragraph XI(c) of the lease. (NSI Exhibit 3)[4].

---

[4]Section II (a) of the master lease states: "Lessee acknowledges that certain of its duties hereunder continue past

7

**Analysis**

Under Alabama law, a breach of contract "consists of the failure without legal excuse to perform any promise forming the whole or part of the contract. Where the defendant has agreed under the contract to do a particular thing, there is a breach and the right of action is complete upon his failure to do the particular thing he agreed to do." *Seybold v. Magnolia Land Co.*, 376 So.2d 1083,85 (Ala. 1979).

NSI argues that there is evidence to demonstrate the existence of disputed facts precluding summary judgment. The court disagrees. Under the master lease, NSI unambiguously promised either to purchase the molding machines at the their residual value or their fair market value at the end of the lease term, whichever was greater, or to return the equipment pursuant to the procedure provided. Section XI of the master lease sets out the procedure for returning the equipment, and it clearly states that "[i]f requested by Lessor, Lessee shall, at its sole cost and expense, take any or all of the

---

the expiration or termination of this Lease, as expressly provided herein, and the use of "Lease Term" herein shall not be deemed to release Lessee from such duties." Section XV "(a) This Lease is a net lease, and Lessee's obligation to pay rent and other amounts due hereunder shall be absolute and unconditional under any and all circumstances and shall not be affected by reason of ...". Section XI (c) states: "Anything herein to the contrary notwithstanding, if Lessee fails to return any Item when required to do so hereunder, Lessee's obligations hereunder shall continue and Lessee shall continue to pay rent hereunder as to such Item at the rate provided in the applicable Schedule; provided, however, that such failure to return shall constitute an immediate Event of Default hereunder and no continuation of the payment of rent or rendering of other performance hereunder shall limit Lessor's rights arising by reason of such Event of Default as to such Item or any other Items."

actions described . . . Lessee shall arrange for inspection of each Item being returned hereunder by an appraiser, servicing organization or manufacturer's representative satisfactory to Lessor. (Master Lease Section XI). NSI did neither. The undisputed evidence is that NSI did not exercise its option to purchase the equipment. Instead, it chose to return the equipment. NSI stopped paying rent at the end of the lease term even though the master lease calls for a continuation of rent under any and all circumstances. NSI did not have the equipment inspected until June 3, 2002, six months after the "lease term" expired and nearly three months after this suit was filed.

Nevertheless, NSI argues that there was no breach because it sought to negotiate an "economic solution" with AmSouth to return the equipment without following the return procedures outlined in the master lease for economic and practical reasons. NSI appears to be taking the position that the lease requirements were no longer applicable because the parties were in negotiations over a different and more economically favorable agreement for one or both parties regarding the return of the equipment. NSI neither sought nor obtained a waiver or release of AmSouth's rights under the contract.

This court is not aware of a legal excuse based on a party's desire to reach an "economic solution" to problems of its own making. If NSI is attempting to argue the legal defense of impracticability or impossibility of performance based on NSI's belief that it would be difficult or impossible or too costly to get the equipment inspected and certified considering the circumstances, NSI fares no better. The

9

Alabama Supreme Court has never recognized the defense of impossibility or impracticability (terminology under Restatement (Second) of Contracts, § 261) "[w]here one by his contract undertakes an obligation which is absolute, he is required to perform within the terms of the contract or answer in damages, despite an act of God, unexpected difficulty, or hardship, because these contingencies could have been provided against by his contract." See *Joel Silverman and Carolyn Silverman v. Charmac, Inc.*, 414 So.2d 892, 894 (Ala. 1982), citing *Alpine Constr. Co. v. Water Works Bd. of the City of Birmingham*, 377 So.2d 954 (Ala. 1979); *Poughkeepsie Sav. Bank v. Highland Terrace Apartments*, 352 So.2d 1108 (Ala. 1977); contra, *Jewell v. Jackson & Whitsitt Cotton Co.*, 313 So.2d 157 (1975).

While there are exceptions to the rule announced in *Charmac*, none apply to the present case. Furthermore, NSI has presented no evidence that it was impossible to follow the return procedures as outlined in section XI. In fact, after the present suit was filed, NSI was able to get the equipment inspected, albeit six months after the lease term expired. The court agrees with AmSouth that NSI's failure to pay rent and return the equipment are "Default Events" as defined in the master lease.

NSI argues next that even if the court finds that it failed to perform its contractual obligations it is not liable for that failure because AmSouth prevented it from performing. NSI asserts that, under Alabama law, where one party to a contract prevents performance by the other party, the one who prevents performance cannot take advantage of the other party's failure to perform its obligations. According to

10

NSI, it specifically requested to return the equipment at the end of the lease term. NSI insists that the equipment could be returned without being inspected and certified, and that the equipment was in good working condition. NSI maintains that it would have returned the equipment but for AmSouth's steadfast refusal to allow for its return without inspection and certification. NSI takes the position that its failure to perform under the master lease was inevitable because AmSouth would not identify a satisfactory manufacturer's representative or servicing organization to conduct the inspection, and AmSouth failed to designate a carrier or location to which the equipment could be returned. NSI argues that AmSouth cannot now take advantage of NSI by claiming damages for breach of the master lease when such breach, if there was one, was caused by AmSouth's failure to act in accordance with the lease. The court disagrees. NSI has presented the testimony of AmSouth's corporate representative, Cooper, attempting to establish that AmSouth refused to allow the equipment to be returned, failed to identify a carrier or a location for delivery of the equipment, or failed to identify a satisfactory manufacturer's representative or service organization to inspect the two molding machines. However, Cooper's testimony does not establish that AmSouth in any way interfered with NSI's return of the equipment. Cooper testified that a situation such as the one at issue, where a lessee wishes to return a piece of equipment rather than to pay the residual, had never arisen during his tenure. The fact that AmSouth sent NSI an invoice is consistent with the custom or practice in financing arrangements like this one. AmSouth does not engage in the business

11

of owning and holding an inventory of equipment and actually leasing it. Cooper logically and without contradiction, testified that AmSouth had not designated a carrier and location for delivery because NSI was still refusing to have the equipment returned without inspection and certification.

AmSouth, by right under the master lease, chose to have the equipment inspected and certified before being returned. NSI's wish to return the equipment without inspection and certification was a hopeful but unsuccessful wish. NSI chose to discontinue the rental payments while negotiating with AmSouth over the return of the equipment. NSI cannot now argue that its breach was caused by AmSouth's refusal to allow the equipment to be returned.

The court is not persuaded by NSI's remaining arguments. Because NSI has not offered any evidence to contradict the amount of damages as calculated and set out by AmSouth, the court finds that there are no genuine issues of material fact and that summary judgment for AmSouth is due to be granted. AmSouth, however, has failed to show proof of a reasonable attorney's fee expended for recovery in this action, and accordingly the court considers this aspect of its claim abandoned.

Because the court finds that summary judgment is appropriate, there is no need to address plaintiff's meritorious motion for sanctions under Rule 26 wherein AmSouth seeks a default judgment. One reason for entering judgment in favor of AmSouth is enough. Accordingly, AmSouth's motion for sanctions will be deemed moot. AmSouth's motion to strike will be denied although it, too, is not

without merit.

## Conclusion

For the foregoing reasons summary judgment for AmSouth Leasing Corporation will be granted. A separate and appropriate order will be entered.

DONE this __13th__ day of February, 2003.

_/s/ William M. Acker, Jr._

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE